UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID BUEHRLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV00509 AGF |
| | ) | |
| CITY OF O'FALLON, MISSOURI, | ) | |
| a Municipal Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant's Motion for Summary

Judgment (Doc. 41).  Plaintiff David Buehrle brought this action against Defendant City

of O'Fallon, Missouri ("the City") alleging retaliation for exercising his rights under the

Missouri Workers' Compensation Act, R. S. Mo. § 287.780; retaliation for exercising his

right to free speech under the First Amendment of the United States and Missouri

Constitutions; and age discrimination in violation of the Missouri Human Rights Act,

R.S. Mo. § 213.055 ("MHRA"), and the Age Discrimination in Employment Act, 29

U.S.C. §§ 621-634 ("ADEA").  The City moves for summary judgment, pursuant to

Federal Rule of Civil Procedure 56(a), on all of Plaintiff's claims.  For the reasons set

forth below, the Court will grant Defendant's motion.

## RELEVANT FACTS

The record in this case establishes the following facts.  Plaintiff is a police officer with the City.  Having twice earlier resigned from the City's police department and later been rehired, Plaintiff was rehired by the City a third time in 2003, as a patrol officer.

Robert Lowery, Jr. was hired by the City to serve as its City Administrator on October 15, 2005.  Prior to his employment by the City, Lowery was a police officer for approximately 25 years, including three years in the position of assistant chief of police. The City Administrator serves as the Chief Executive Officer of the City, and is responsible for day-to-day operations.  All of the City's employees work for the City Administrator.  In his role as City Administrator, Lowery was more actively involved with the police department than previous City Administrators.

Jerry Schulte was the Chief of Police for the City from August 2005 until his retirement in January 2009.  He was replaced by William Seibert, who was temporarily promoted to the position of Interim Chief of Police in January 2009, and served in that position until December 2009, when a new chief was hired.

In July 2005, Schulte assigned Plaintiff to work at City Hall and conduct certain investigations at the request of the mayor.  The mayor assigned Plaintiff to investigate thefts of funds by the former Court Clerk, missing City property, an issue involving developers and their relationship with City employees, the destruction of computer files, and a tow company contract.  Plaintiff was also assigned to investigate the origin of an email disclosing the closed criminal record of a local business person; to investigate the destruction of files and records by Cash Sweiven, the City Administrator at the time; and

2

later, at the request of Lowery, to investigate suspected employment of illegal immigrants at the O'Fallon Lakes project.

After working at City Hall for several months, the City's Board of Aldermen asked Plaintiff to make a report of his findings at a closed session meeting on January 26, 2006. In his presentation, Plaintiff read verbatim from a report of his findings, which discussed the various issues he had been investigating and included suggestions regarding changes the City could make and actions the City could take in response to his findings.  Plaintiff provided a copy of his report to the Board of Aldermen during his presentation, and collected these copies at the end of the meeting so they would not be disseminated outside of the closed session meeting.  Plaintiff provided this same information to Deputy Chief Kyle Kelley to review in evaluating Plaintiff's performance for the period that included his assignment to City Hall.

Lowery believed that the contents of Plaintiff's presentation to the Board of Aldermen, and Plaintiff's behavior at the meeting, were inappropriate.  Lowery believed that Plaintiff's report regarding his investigations included wild allegations and conclusions regarding the management, leadership, and practices of the City, which were beyond Plaintiff's rank.  Shortly after his presentation, Plaintiff requested to be transferred to a patrol position, and received his transfer in approximately February or March 2006.

Plaintiff ruptured his Achilles tendon while on duty on July 7, 2007, and filed a workers' compensation claim for the injury.  On-the-job injuries are common among police officers, and Plaintiff was never discouraged from filing his worker's

compensation claim.  Prior to his injury, Plaintiff had been assigned to the midnight shift.

Following the injury, he was on light duty and worked daytime hours that were

comparable to the day shift.

In 2007, the City changed its promotion policy.  Under the prior promotion policy,

the Chief of Police had a certain number of points that he could allot to candidates, but he

was then required to promote the top ranked candidate.  The new policy removed the

police chief's ability to affect the ranking of the candidates, as well as the requirement

that the top candidate be selected, and implemented a new rule that the police chief had

the discretion to select from the top three candidates.  Plaintiff applied for a promotion to

sergeant in November 2007 and, despite finishing first in the promotion process, was not

promoted.  The second ranked candidate, a younger officer, was promoted.  Plaintiff was

still on light duty because of his injury at the time.  Lowery told Schulte and other

command staff that he would not allow the promotion of Plaintiff as long as he was City

Administrator.  For this reason, Schulte did not consider Plaintiff for the promotion.

Schulte also testified that regardless of Lowery's position, he would not have promoted

Plaintiff because he was aware of animosity for, and distrust of, Plaintiff by other officers

in the department.

Also in 2007, Lowery hired Seibert for the position of major, even though he did

not meet the City's education qualifications for major.  In 2008, Seibert was given the

responsibility of conducting an Internal Affairs investigation into a complaint that

Plaintiff lied under oath in federal court regarding a complaint lodged against Plaintiff in

1991 and whether Plaintiff had been subsequently disciplined for that complaint in 1992.

4

After investigating the complaint, Seibert recommended that the complaint be sustained and that Plaintiff be terminated.  The City ultimately did not sustain the original charge of lying, but gave Plaintiff a written reprimand for giving testimony which "could be construed as less than accurate."

When Plaintiff returned from light duty in January 2008, he was assigned to the afternoon shift, and remained in the afternoon shift for three years.  The City attempts to make shift assignments taking into account an officer's preferences, the needs of the command, and the needs of certain officers regarding childcare or education course work. There is no difference in pay between the shifts, but employees who work the afternoon or evening shift have a higher potential for earning overtime.  Officers are placed on a list based upon their first, second or third preference of shift assignment.  Officers who are given their first choice fall to the bottom of the list for shift preference the following year. At the beginning of 2008, Plaintiff was located 16 spots down on the list.  Also, Plaintiff was married to another police officer, and per department policy, he could not work the same shift that his wife was assigned.

On January 10, 2008, a new light duty policy was enacted limiting light duty to three people at any time.  To be eligible for light duty, employees were required to show a bona fide job need or work duty.  Prior to this new policy, the City did not limit the number of people on light duty, so long as there was available work.  Lowery wanted this new light duty policy implemented because there were so many people on light duty at the police department, and the City of Florissant, where he had previously served for 25 years, had a light duty policy.

The light duty policy was revised on June 27, 2008 to make a distinction between on-duty and off-duty injuries.  Schulte understood the new policy to mean that when counting the number of light duty positions filled, Lowery did not want him to count the people on light duty for pregnancy as part of the total allowed number of three when determining whether to award light duty for on-duty injuries.  However, Schulte understood that Lowery wanted him to count the people on light duty for pregnancy as part of the total allowed number of three when determining whether to award light duty for off-duty injuries.

While on crutches following the surgery on his Achilles tendon, Plaintiff developed an injury to his elbow and had surgery on his elbow in June 2008.  The City did not treat Plaintiff's elbow injury as a work-related injury.  Following his elbow surgery, Plaintiff initially was granted light duty, but later was denied light duty positions twice in July 2008, and was told these denials were because too many people were on light duty under the new policy.  At that time, one light duty position was filled by an on-duty injury, one position was filled by a pregnancy, and both Plaintiff and another off-duty injury were in need of light duty.  When he denied Plaintiff light duty, Schulte counted the pregnancy toward the total number of spots available for light duty for off-duty injuries.

Plaintiff made two requests for transfer to the detective unit in 2008, both of which were rejected.  When Plaintiff made his first request for transfer, he was the first choice of the lieutenant in charge of the detective bureau, but a younger officer was transferred instead of Plaintiff.  When Plaintiff made his second request for transfer, the lieutenant in

charge did not submit Plaintiff's name to be included in the list of candidates.  Lowery testified that he would not approve any transfer of Plaintiff to the detective bureau because detectives worked with less supervision than a patrol officer and he felt that Plaintiff would not act in the best interest of the police department.

Also in 2008, a sergeant notified Seibert that a citizen complaint regarding Plaintiff might be forthcoming, and Seibert pulled the reports on the arrest at issue and sent a note back to the sergeant indicating that it appeared to Seibert that Plaintiff had done everything properly.  In the meantime, Plaintiff sent what Seibert considered to be a scathing email accusing Seibert of jumping to conclusions and initiating a complaint on him without listening to his side of the story.  As a result, Seibert became concerned that Plaintiff jumped to conclusions and was willing to attack a member of the command staff without first getting the full facts.  However, Seibert did not change a June 2008 evaluation of Plaintiff that stated the Plaintiff had "excellent judgment" and "did not jump to conclusions," because Seibert testified that he did not change evaluations based on one example of behavior.  Instead, Seibert reviewed and approved the evaluation.

Seibert was temporarily promoted to the position of Interim Chief of Police in January 2009.  In June 2009, the 2007 promotion list was still in effect.  While Plaintiff was still the number one ranked candidate for sergeant, he was passed over again for sergeant at that time.  Seibert conducted interviews of the top three candidates in order to make his promotion decision.  Seibert made it known that he believed the education component had been weighed too heavily for certain degrees that were not required for the position.  He did not change the ranking of the candidates based on that information,

7

but he did consider this information in choosing among the top three candidates. He also testified that he looked for a candidate with integrity, whom he could depend upon to support his vision, and who did not jump to conclusions. With regard to those attributes, Seibert gave the candidates a clean slate as to any discipline that had occurred prior to his employment with the City on September 10, 2007.

Having considered these components, Seibert offered the position to a candidate whose philosophies he felt more closely mirrored his own; however, his first choice candidate declined the promotion. Seibert then promoted his second choice candidate, who was younger and had less years of experience than Plaintiff, because Seibert believed that candidate's philosophies fell more in line with his own, and that he showed integrity, dependability, and did not jump to conclusions. Seibert did not promote Plaintiff because Seibert felt that Plaintiff jumped to conclusions, as a result of the 2008 email Plaintiff sent to Seibert, and because Seibert did not trust Plaintiff, as a result of Seibert's 2008 Internal Affairs investigation of Plaintiff. A second opening for sergeant was left unfilled rather than promoting Plaintiff.

In June 2010, Seibert approved an evaluation that expressly stated Plaintiff did not jump to conclusions.

During the course of this lawsuit, Plaintiff participated in the promotion process for promotion to sergeant in September 2010 and finished first. He was promoted to sergeant in October 2010.

## SUMMARY JUDGMENT STANDARD

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record.  *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 610 (8th Cir. 2007).

The initial burden to establish the absence of material facts is placed on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).  Once discharged, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, or on mere denials or allegations, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e);  *Hernandez v. Jarman*, 340 F.3d 617, 622 (8th Cir. 2003); *Herring v. Can. Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000); *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir. 1999).  The non-moving party "must do more than simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Herring*, 207 F.3d at 1029 (quoting *Anderson*, 477 U.S. at 248).  A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact.  *See Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004).  "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).

## DISCUSSION

### First Amendment Retaliation Claims

Addressing the federal claims first, Plaintiff asserts in Count II of the Amended Complaint that the City violated his rights to freedom of speech under the First Amendment to the United States and Missouri Constitutions.  He observes correctly that "[a] public employer may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech," *McGee v. Public Water Supply, District #2*, 471 F.3d 918, 919 (8th Cir. 2006), and alleges that the City terminated him based on protected speech to the Board of Aldermen.

A public employee retains a degree of First Amendment protection when he speaks as a citizen addressing matters of public concern.  *See Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006).  But if speech is outside this category, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at

10

418.  In particular, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.* at 421; *see Bonn v. City of Omaha*, 623 F.3d 587, 592 (8th Cir. 2010).

It is undisputed in this case that Plaintiff, as a patrol officer assigned to City Hall, had been given a special assignment by the Mayor to investigate allegations of wrongdoing by internal employees and former employees of the City, and that he was specifically commissioned by the Board of Aldermen to give the presentation on what he had been investigating during this special assignment and what information he had uncovered.  Plaintiff testified that he sought Lowery's advice on how to make a presentation to the Board of Aldermen and Lowery advised him to "give a synopsis as to where things were at . . . or a conclusion as to what maybe could be done to prevent [the issues]."  (Doc. 63-3 at 3,4.)  Plaintiff also testified that the report he provided to the Board of Aldermen discussed each issue briefly and offered either a conclusion or possible solution for each issue.  *Id.*

The Court finds this case to be analogous to *Bonn v. City of Omaha*, where the plaintiff was terminated after publishing a report she had prepared as a function of her position as the Public Safety Auditor.  623 F.3d at 589-90, 92.  The Court in *Bonn* held that because the plaintiff had published the report as a function of her job, she did not speak as a citizen, and therefore her speech was not protected speech.  *Id.* at 592.  Similarly, Plaintiff conducted his investigations and prepared and delivered his report to the Board of Aldermen as a function of his job assignment to conduct investigations at

11

City Hall, and per his own testimony, the solutions and recommendations he provided to the Board of Aldermen during his report were also within that assignment.  It is therefore undisputed that Plaintiff did not speak as a citizen when he made his report to the Board of Aldermen, and that he has no cause of action based on Lowery's reaction to the report. That Lowery felt that Plaintiff overstepped his bounds in making the speech does not change the fact that he spoke as a public employee.  "The controlling factor is whether the expressions were made pursuant to the employee's duties, not whether the employer ultimately approved of the expressions or related actions."  *Id.* at 593.  As such, the City is entitled to summary judgment on Count II of Plaintiff's First Amended Complaint.

### Age Discrimination Claims under the MHRA and the ADEA

Plaintiff alleges in Counts III and IV that he was denied promotion to the position of sergeant because of his age, in violation of the MHRA (Count III) and the ADEA (Count IV).

The ADEA requires a plaintiff to file charges of discrimination with the Equal Employment Opportunity Commission within 300 days after the "alleged unlawful employment practice occurred" before bringing his claims in court.  *See* 42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1327 (8th Cir. 1995) ("If a plaintiff fails to file a timely charge, the lawsuit is barred unless he or she can demonstrate that the limitations period is subject to equitable modification such as waiver, estoppel, or tolling.").  Similarly, the MHRA requires a plaintiff to file his charges of discrimination with the Missouri Commission on Human Rights within 180

days of the challenged employment practice.  R. S. Mo. § 213.075; *accord Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007).

Plaintiff filed his charge of discrimination with respect to the denial of promotion to sergeant with both the Equal Employment Opportunity Commission and Missouri Commission on Human Rights on June 18, 2009.  The ADEA limitations period therefore bars Plaintiff from asserting any alleged unlawful employment practice that occurred prior to August 22, 2008, and the MHRA limitations period bars Plaintiff from asserting any alleged unlawful employment practice that occurred prior to December 20, 2008. Accordingly, Plaintiff's claims based on the November 2007 promotion to sergeant decision are precluded, and Plaintiff's age discrimination claim is limited to the June 2009 denial of promotion for which he filed a timely charge of discrimination.

In connection with Plaintiff's claim based on being denied a promotion to sergeant in June 2009, the Court notes that "the same analysis applies for age discrimination claims under both the ADEA and the MHRA."  *West v. Conopco Corp.*, 974 S.W.2d 554, 556 (Mo. Ct. App. 1998).  When, as here, a plaintiff brings claims under these statutes but has no direct evidence of discrimination, his claims are analyzed using the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Johnson v. AT&T Corp.*, 422 F.3d 756, 761 (8th Cir. 2005); *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 728-29 (8th Cir. 2002).  Under this familiar framework, Plaintiff must first "present a prima facie case of intentional discrimination." *Putnam v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003).  To establish a prima facie case of age discrimination under the ADEA, Plaintiff must show that: (1) he was a

13

member of a protected age group – over 40 years old – at the time he was not promoted;

(2) he was qualified for an available position; (3) he was rejected; and (4) employees

similarly situated but not part of the protected group were promoted instead.  *See Loeb v.*

*Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008); *Calder*, 298 F.3d at 729; *Ross v.*

*Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002).

Plaintiff contends that he is able to meet his burden of demonstrating a prima facie

case of age discrimination.  The parties do not dispute that Plaintiff was an individual

over the age of 40 years, he was qualified for the promotion, he was not promoted, and a

younger officer was promoted instead.  Therefore, the burden shifts to the City to

articulate a legitimate, nondiscriminatory reason for its action.  *Putnam*, 348 F.3d at 735.

The Court finds that the City has met this burden by presenting evidence that

Plaintiff did not possess the qualities that Interim Chief Seibert was looking for in a

sergeant to the degree that the other two candidates did.  Seibert testified in his deposition

that he believed that Plaintiff was someone who would jump to conclusions based upon

his personal experience with Plaintiff, specifically Seibert's receipt of the critical email

from Plaintiff, and that he believed that Plaintiff was not honest as a result of the 2008

Internal Affairs investigation of Plaintiff he had conducted.  Thus, the question is whether

Plaintiff has shown by a preponderance of the evidence that the City's proffered reason is

merely pretext for unlawful discrimination.  *See, e.g., Tyler v. University of Ark. Bd. of*

*Trs.*, 628 F.3d 980, 986 (8th Cir. Jan. 6, 2011).

Plaintiff contends that Seibert's reasons for not promoting Plaintiff were merely

pretext for age discrimination because Seibert's reasons were unworthy of belief and

14

were inconsistent with Seibert's other evaluations of Plaintiff.  Plaintiff argues that

Seibert signed off on other evaluations of Plaintiff that noted Plaintiff's excellent

judgment skills and did not note that Plaintiff jumped to conclusions.  Plaintiff also

argues that the 2008 Internal Affairs investigation was incomplete and insufficient.

In response to the motion for summary judgment, Plaintiff also submitted the

affidavit of Tom Kerns in support of Plaintiff's contention that Seibert did not conduct a

thorough investigation in 2008 because Seibert did not contact Kerns regarding the 1991-

1992 investigation of Plaintiff.  In his affidavit, Kerns stated that a citizen filed a

complaint against Plaintiff in 1991, and at that time, Kerns was Plaintiff's direct

supervisor.  Kerns stated that, while an investigation was undertaken into the matter, no

punishment or discipline was implemented against Plaintiff as a result of that complaint.

Kerns also attested that no one from the City contacted him in 2008 to ask about this

investigation or whether Plaintiff had been disciplined as a result of the investigation.

Defendant has filed a motion to preclude consideration of the Kerns affidavit

(Doc. 66), due to Plaintiff's failure timely to disclose Kerns as a person with information.

The Court finds Defendant's motion to be well taken, and does not believe that Kerns'

affidavit should be considered for purposes of the present motion for summary judgment

because Plaintiff only disclosed Kerns in a supplemental Federal Rule of Civil Procedure

26 disclosure made over two months after the close of discovery in this case.  While

Plaintiff claims that Kerns' affidavit was purely for impeachment purposes and therefore

need not have been disclosed, the Court finds that Plaintiff's use of Kerns' affidavit was

at least partially substantive, and therefore was required to be disclosed in accordance

with Rule 26(a).  *Klonoski v. Mahlab,* 156 F.3d 255, 270 (1st Cir. 1998) (superceded in unrelated part by rule amendment) (holding that when evidence serves both impeachment and substantive functions, "it is not covered by the exception to the Rule 26 discovery requirements, and must be disclosed in accordance with Rule 26(a).").  Plaintiff's use of Kerns' affidavit is not simply to attack the credibility of a particular witness, but also to create a genuine issue of material fact as to whether Plaintiff was disciplined as a result of the 1991 investigation, whether Kerns was in fact Plaintiff's supervisor, and whether the City's 2008 investigation was a complete and thorough investigation.  Plaintiff had reason to know the relevance of these matters long before the close of discovery.

The Court also finds that Plaintiff's failure to disclose Kerns at an earlier stage in discovery prevented the City from taking additional steps to prepare for Kerns' testimony. *Sellers v. Minetta,* 350 F.3d 706, 712 (8th Cir. 2003).  Moreover, as in *Monsanto v. Bayer Bioscience, N.V.*, No. 4:00CV01915 ERW, 2005 WL 5989796, *21 (E.D. Mo. Oct. 28, 2005), the City realistically could not have been expected to recognize Kerns as a potential witness "just because his name appeared in some of the thousands of documents produced in this case." *Id.* at *21.  "The very purpose of FRCP 26 is to avoid an unfair surprise." *Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993).  The Court finds that Plaintiff has failed to provide adequate justification for his untimely disclosure of Kerns, and that the City was prejudiced by Plaintiff's untimely disclosure.

For purposes of this motion for summary judgment, however, even if the Court accepted and considered Kerns' affidavit, it would not affect the Court's determination of the issue; Plaintiff's arguments are without merit because he misconstrues the Court's

16

role in deciding this case.  Plaintiff's  evidence "must do more than merely raise doubts about the wisdom and fairness of the opinions of him held by his superiors . . . .  It must create a real issue as to the genuineness of those perceptions." *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002).  "Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices.  *Id.*  "Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'" *Id.* (quoting *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001)).  The City has submitted evidence that Seibert interviewed Plaintiff regarding the 1991-1992 investigation and disciplinary action, reviewed Plaintiff's federal court testimony in which he claimed the investigation against him was unsustained and he received no discipline, and reviewed Plaintiff's 1992 employee evaluation, which was also signed by Plaintiff, which indicated that Plaintiff once received a five-day suspension.  (Doc. 72-5.)  Other than simply attributing age bias to Seibert, Plaintiff does little to establish a reasonable basis for inferring that Seibert's beliefs about Plaintiff's personal qualities were anything but genuine, regardless of their accuracy.  *Edmund*, 299 F.3d at 866.  *See also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935-36 (8th Cir. 2006) (explaining that, even assuming the underlying reason for the adverse action was false, the plaintiff failed to produce admissible evidence from which to conclude the employer did not honestly believe the asserted grounds at the time of the termination); *Macias Soto v. Core-Mark Intern., Inc.*, 521 F.3d 837, 842 (8th Cir. 2008) (holding that

17

the employee failed to create a factual dispute about the employer's good faith belief in the grounds for termination).

Because Plaintiff has failed to establish that the City's asserted justification for not promoting Plaintiff to sergeant in 2009 was pretextual, the City is entitled to summary judgment as to Counts III and IV.

### State Law Workers' Compensation Retaliation Claims

In Count I of his complaint, Plaintiff claims that the City retaliated against him in violation of Section 287.780 of the Missouri Revised Statutes for filing a workers' compensation claim.  In Missouri, no employer may discriminate against, or discharge, an employee for exercising any rights under the Workers' Compensation Act.  *See* R.S. Mo. § 287.780.  However, the Act was enacted into law against the backdrop of the "at will" doctrine.  *See Crabtree v. Bugby*, 967 S.W.2d 66, 70 (Mo. banc 1998).  "Absent a contrary statutory provision, an at will employee cannot maintain an action for wrongful discharge against his employer."  *Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. banc 1985). "In the absence of a contract for employment for a definite term or a contrary statutory provision, an employer may discharge an employee at any time, without cause or reason, or for any reason, and in such cases no action can be obtained for wrongful discharge." *Amaan v. City of Eureka*, 615 S.W.2d 414, 415 (Mo. banc 1981).   The Workers' Compensation Act did not abolish the at will doctrine, but rather "provided a limited exception which allows an action where there was an exclusive causal relationship between the discharge and the employee's exercise of rights granted under chapter 287 RSMo 1978."  *Crabtree*, 967 S.W.2d at 70.  "If the evidence demonstrates that the

18

employer had just cause for terminating the employment, other than for the employee's exercise of his rights under the Act, then the employee cannot recover under section 287.780." *St. Lawrence v. Trans World Airlines, Inc.*, 8 S.W.3d 143, 150 (Mo. Ct. App. 1999).

To establish a claim under the statute, Plaintiff must prove that: (1) he was employed by the defendant before the injury; (2) he filed a workers' compensation claim; (3) the City discriminated against or discharged him; and (4) there is an exclusive causal relationship between his filing and the City's actions. *See Crabtree*, 967 S.W.2d at 70; *Hansome v. NW. Cooperage Co.*, 679 S.W.2d 273, 275 (Mo. banc 1984). "Causality does not exist if the basis for discharge is valid and nonpretextual." *Hansome*, 679 S.W.2d at 275 n. 2; *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028-29 (8th Cir. 2006).

The only element challenged by the City's motion for summary judgment is element four, that the record demonstrates an exclusive causal relationship between Plaintiff's exercise of his right to claim workers' compensation benefits and the City's actions towards Plaintiff. The City argues that, despite the circumstantial evidence presented by Plaintiff, it is entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff admitted alternate reasons for the City's failure to promote him and provide him with his requested work assignments, and for the City's 2008 Internal Affairs investigation of Plaintiff. When the employee admits valid and nonpretextual alternative reasons for the employer's actions, the employer is entitled to summary judgment because the employee's exercise of his rights under the Workers' Compensation Laws would not

19

be the exclusive cause for his termination.  *Coleman v. Winning*,  967 S.W.2d 644, 648-49 (Mo. Ct. App. 1998).  Plaintiff alleges multiple adverse employment decisions, and the Court will discuss each of these decisions individually.  As discussed more fully below, the Court finds that Plaintiff has failed to make a submissible case of retaliation, in that he has not proven that this exercise of his workers' compensation rights was the exclusive case of the City's actions, and because his assignment to the afternoon shift was not an adverse employment action.

      1.  <u>Light Duty Assignments</u>

Plaintiff claims that he was denied light duty work because of his workers' compensation claim.  In his response to the City's statement of undisputed facts, however, Plaintiff asserts that he was sent home from light duty as discrimination and retaliation for "his exercise of his workers' compensation rights and/or his exercise of his First Amendment right of free speech by giving a presentation to the Board of Aldermen." (Doc. 55 at ¶ 31.)  Plaintiff makes these same arguments in his opposition to the City's motion for summary judgment, arguing both that the evidence before the Court shows that Plaintiff was denied light duty work in retaliation for his workers' compensation claim and that "the real reason [for the City's actions in denying him light duty] was retaliation for Plaintiff's speech to the Board of Alderman."  (Doc. 52 at 7, 27.)  These statements demonstrate Plaintiff's belief that his speech before the Aldermen was an alternative reason for the City denying Plaintiff light duty.  As discussed more fully above, Plaintiff's speech before the Aldermen was not subject to First Amendment protection.  *See Garcetti*, 547 U.S. at 417-18.  Therefore, Plaintiff's admission of this

lawful alternative reason for the City's denying him light duty defeats his claim of retaliation with respect to his denial of light duty work.  *See Coleman,* 967 S.W.2d at 648-49.

2. 2007 and 2009 Sergeant Promotions

Plaintiff also claims that he was denied a promotion to the rank of sergeant in 2007 and 2009 because of his workers' compensation claim.  However, in his own statement of additional undisputed facts, Plaintiff asserts that he was not promoted to sergeant in 2007 because of his 2006 speech to the Board of Aldermen and his work at City Hall, and makes this same argument in his opposition to the City's motion for summary judgment. (Doc. 64 at ¶¶ 155-59, 162; Doc. 52 at 9, 25.)  Once again, Plaintiff's own admissions and arguments provide a lawful alternative reason for the City failing to promote Plaintiff that defeats his claim of retaliation with respect to his denial of promotion to sergeant in 2007.

With respect to his failure to be promoted in 2009, Plaintiff asserts that a younger candidate with less experience and fewer qualifications was promoted to sergeant instead of him.  (Doc. 64 at ¶ 179.)  He also argues that Seibert's reasons for not promoting him in 2009 were mere pretext for age discrimination.  (Doc. 52 at 29.)  Because the Court has granted summary judgment in favor of the City on Buehrle's claims of age discrimination, Plaintiff's alternative reason for the City denying him a promotion to sergeant in 2009 was lawful and defeats Plaintiff's claim of retaliation with respect to his denial of promotion to sergeant in 2009.

3.  <u>January 2008 and July 2008 Detective Assignments</u>

Plaintiff also claims that he was denied a detective assignment in January 2008 because of his workers' compensation claim.  Despite this claim, in his response to the City's statement of undisputed facts, Plaintiff admits that he believed that "Dean Frye was chosen for the vacancy in the detective bureau in January 2008 because he was good friends with, played golf and went fishing with Chief Schulte."  (Doc. 55 at ¶ 87.) Plaintiff also argues that the evidence shows that "Defendant retaliated against Plaintiff by failing to transfer him to the detective bureau in January 2008 and again in July 2008 . . . [in] retaliation for his exercise of his First Amendment right of free speech."  (Doc. 52 at 26.)  These statements again demonstrate Plaintiff's belief that there were other reasons for the City denying Plaintiff detective assignments -- reasons this Court finds were not unlawful -- which therefore defeats Plaintiff's claim of retaliation with respect to his denial of these detective assignments.

4.  <u>February 2008 Internal Affairs Investigation</u>

Plaintiff also claims that the 2008 Internal Affairs investigation of Plaintiff was undertaken in retaliation for his workers' compensation claim.  (Doc. 55 at ¶ 82.) However, Plaintiff's response to the City's statement of undisputed facts asserts that Plaintiff believes that the 2008 Internal Affairs investigation "was in retaliation for the investigation that the Plaintiff had conducted while assigned to City Hall."  (Doc. 55 at ¶ 81.)  These statements again demonstrate Plaintiff's belief that there were lawful alternative reasons for the City's 2008 Internal Affairs investigation, and defeat his claim of retaliation with respect to this investigation.

22

5.  Shift Assignment

Lastly, Plaintiff claims that he was denied his preferred shift assignment, the day

shift, because he brought a workers' compensation claim.  Plaintiff complains that the

afternoon shift "is a rough shift that nobody wants."  (Doc. 52 at 18.)  The Court

concludes that Plaintiff has failed to demonstrate that he suffered from an adverse

employment action when he received his afternoon shift assignment.  "'[N]ot everything

that makes an employee unhappy is an actionable adverse action." *Altonen v. City of*

*Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007) (quoting *Bechtel v. City of Belton*, 250

F.3d 1157, 1162 (8th Cir. 2001).  A challenged employment action is adverse for the

purposes of a claim for retaliation if "the alleged employment action adversely and

materially altered the terms or conditions of [his] employment." *Id.*

The Eighth Circuit has determined that routine reassignments do not rise to the

level of adverse employment actions when a plaintiff's pay, benefits, and title remain the

same. *See Duffy v. McPhillips*, 276 F.3d 988, 992 (8th Cir. 2002).  The undisputed

evidence in this case demonstrates that there is no difference in pay between the shifts,

and employees who work the afternoon or evening shift have a higher potential for

earning overtime.

Moreover, at the time Plaintiff was placed on the afternoon shift in January 2008,

the undisputed evidence shows that Plaintiff was located 16 spots down the shift

preference list at that time, and there is no evidence in the record that he was entitled to

his first choice of shifts.  Rather, the record demonstrates that the City attempts to make

shift assignments by taking into account an officer's preferences, the needs of the

command, and the needs of certain officers regarding childcare or education course work. Additionally, department policy dictated that because Plaintiff was married to another police officer, he could not work the same shift that she was assigned.

It therefore appears that Plaintiff was merely dissatisfied with his shift assignment, which the City had the right to assign. *See Duffy*, 276 F.3d at 992. The Court finds that Plaintiff has failed to offer evidence which would allow a reasonable jury to conclude that he suffered an adverse employment action when he was assigned the afternoon shift in January 2008. As such, Plaintiff has failed to make a prima facie case of retaliation with respect to his shift assignment.

## **CONCLUSION**

The Court finds that Plaintiff has failed to make a submissible case of retaliation for his filing a workers' compensation claim because he has admitted alternative reasons for the City's alleged adverse employment actions, and because his assignment to the afternoon shift in January 2008 was not an adverse employment action. The Court further finds that Plaintiff did not speak as a citizen when he made his report to the Board of Aldermen and, therefore, Plaintiff has failed to establish that his speech was protected under the First Amendment. Lastly, the Court finds that Plaintiff's claim of age discrimination related to the November 2007 promotion is barred by the applicable limitations period, and that Plaintiff has failed to establish that the City's asserted justification for not promoting him to sergeant in 2009 was pretextual, defeating his claims for age discrimination.

24

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 41) is **GRANTED.**

**IT IS HEREBY ORDERED** that Defendant's Motion for Preclusion (Doc. 66) is **DENIED as moot.**

**IT IS HEREBY ORDERED** that Defendant's Motion for Preclusion (Doc. 77) is **DENIED as moot.**


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 12th day of July, 2011.

25